U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG 27 PM 4: 46

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UMB BANK, N.A.,                        )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Case No. 2:17-cv-00231
                                       )
CITY OF WINOOSKI, VERMONT,             )
                                       )
        Defendant.                     )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
CITY OF WINOOSKI'S MOTION TO DISMISS THE FIRST AMENDED
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND
FAILURE TO STATE A CLAIM**
(Doc. 15)

Plaintiff UMB Bank, N.A. brings this action under 42 U.S.C. § 1983 against

Defendant City of Winooski (the "City"), alleging that the City violated the Takings

Clause of the Fifth Amendment, procedural due process, and substantive due process

when it engaged in an unlawful taking of Spinner Place Student Housing's right to park

in an adjacent parking garage. Pending before the court is the City's motion to dismiss

Plaintiff's claims for lack of subject matter jurisdiction and for failure to state a claim

upon which relief can be granted. (Doc. 15.) On May 3, 2018, the court took the

pending motion under advisement.

Plaintiff is represented by Ronald A. Shems, Esq. The City is represented by

Catherine Dingle, Esq. and Daniel A. Seff, Esq.

**I.      Factual Background.**

The facts are derived from Plaintiff's First Amended Complaint as well as

documents attached to the parties' pleadings.[1] The parties agree that the court may

---

[1] In analyzing a motion to dismiss, the court considers the facts alleged in the complaint, "any
written instrument attached to [the complaint] as an exhibit[,]" "documents incorporated in [the
complaint] by reference[,]" and any documents considered "integral to the complaint." *Nicosia*

consider these documents without converting the motion into one for summary judgment. *See Parada v. Banco Indus. De Venez., C.A.*, 753 F.3d 62, 67-68 (2d Cir. 2014) (affirming the district court's "discretion" under Rule 12(d) to decide "to convert" a motion to dismiss into a motion for summary judgment).

Plaintiff, a nationally chartered bank based in Kansas City, Missouri, is the bond trustee for the holders of the Vermont Housing Finance Agency's ("VHFA") Student Housing Facilities Revenue Bonds (the "Bonds"). Issued in 2004, the Bonds financed the development of Spinner Place Student Housing ("Spinner Place"), located at Unit 2 of the West Block Condominium, 25 Winooski Falls Way, Winooski, Vermont, and are secured by a leasehold mortgage on the property. CHF-Winooski, LLC ("CHF-Winooski") is a non-profit corporation that develops and operates student housing. It borrowed the funds raised by the Bonds for the development of Spinner Place which debt is secured by the leasehold mortgage. HallKeen Management, Inc. manages Spinner Place.

As trustee for the bondholders, Plaintiff "may exercise all rights under the leasehold mortgage and has full rights to protect the value of [Spinner Place as] the collateral for the Bonds[.]" (Doc. 14 at 2, ¶ 5.) Spinner Place is the sole source of funds to make payments of interest and principal on the Bonds. In its capacity as trustee, Plaintiff is a third-party beneficiary of leases governing the development and use of Spinner Place. Accordingly, Plaintiff alleges it "has an active interest" in the "management and operation" of Spinner Place in order "to best preserve and increase the value of the collateral for the Bonds, assure the financial viability of Spinner Place . . ., and best meet [the] financial and other obligations of the borrower of the Bond proceeds." *Id.*

The City is a municipal entity formed and operating under the laws of the State of Vermont. At all relevant times, it is alleged to have acted under the color of state law.

---

*v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks omitted). If a document is "integral" to the complaint, the court will not consider it if a "dispute exists regarding the authenticity or accuracy of the document." *Id.* at 231 (internal quotation marks omitted).

The City owns the real property on which the West Block Condominium, a seven-story building, is located. HKW, LLC ("HKW") developed the West Block Condominium.

On July 1, 2004, the City entered into a Declaration of Condominium for the West Block Condominium, creating two units. Unit 1, on the ground floor, consists of retail and commercial space, and is held by HKW Retail, LLC ("HKW Retail"). Unit 2 is Spinner Place, which occupies floors two through six and is comprised of eighty-five apartment-style suites with 312 bedrooms for student housing. Unit 2 is sub-leased to CHF-Winooski.

Adjacent to and physically connected with Spinner Place is a City-owned and operated municipal parking garage (the "parking garage"). Plaintiff alleges that the City is obligated to provide spaces in the parking garage for Spinner Place and that "[u]se of the parking garage is a property interest held by, and a benefit to[,] CHF-Winooski[] and is pledged to" Plaintiff, the trustee, as collateral for the Bonds. *Id.* at 3, ¶ 15. Plaintiff claims that, effective January 1, 2017, the City denied Spinner Place's right to park in the parking garage notwithstanding Spinner Place's use of spaces in it from February 8, 2010 to December 31, 2016 with the City's alleged consent.

## A. The City's Act 250 Permit for its Downtown Development Project.

On April 26, 2000, the City and other unidentified entities applied for an Act 250 master plan permit for the proposed Winooski Downtown Development Project (the "Project").[2] The Project involves the development of approximately 20.4 acres of land located east of Main Street, south of East Allen Street, and north of the Winooski River in the City's downtown. The Project's Act 250 application purportedly calls for: approximately 250,000 square feet of offices; 92,000 square feet of retail or restaurant space; 800 units of housing; 3,100 parking spaces, including the parking garage; and other uses and amenities to be built in phases. The parking analysis provided in support

---

[2] Act 250, 10 V.S.A. §§ 6001-6093, was enacted "to protect Vermont's lands and environment by requiring statewide review of large-scale changes in land utilization." *In re N. E. Materials Grp. LLC Act 250 JO #5-21*, 2015 VT 79, ¶ 15, 199 Vt. 577, 585, 127 A.3d 926, 932 (internal quotation marks omitted). "Act 250 ordinarily requires a permit prior to the commencement of development." *Id.* (citing 10 V.S.A. § 6081(a)).

of the Act 250 application indicates that the Project will require 4,300 parking spaces, but because the Project is "mixed use, parking spaces can be shared by the different uses needing parking at differing times of the day or night, [such that] the need for parking was set at 3,100 spaces." *Id.* at 4, ¶ 21.

On July 6, 2001, Act 250 Permit # 4C1065 (Revised) was issued, granting the City's application for a master plan permit and allowing commencement of construction of Phase I of the Project. On February 19, 2002, the City and other applicants filed an application to amend the master plan and begin construction of Phase II of the Project. Phase II called for a mixed-use commercial block, which later became known as the West Block, with approximately 108,000 square feet of offices for Vermont Student Assistance Corporation ("VSAC") and commercial or retail space supported by an approximately 1,100 space parking garage. The parking garage was intended to be "the core of this commercial mixed-use block." *Id.* at 5, ¶ 24. According to Plaintiff, "[t]he City and other applicants represented to the District [Environmental] Commission that the mixed-use block, including the Spinner Place[,] . . . would be served by the parking garage." *Id.* at 5, ¶ 26. "Plans for the Spinner Place . . . submitted by the City and its co-applicants to the District [Environmental] Commission show 22 doors and walkways, providing multiple direct connections from each floor of the Spinner Place . . . to all but the underground level of the parking garage." (Doc. 14 at 5, ¶ 27.)

On September 25, 2002, Act 250 Permit # 4C1065-1 for Phase II issued, allowing the City and others to begin construction of Phase II. The District Environmental Commission found that:

The Mixed Use building[, known as the West Block,] surrounds the parking garage on three sides: East Canal on the south, Barlow on the east and New Street on the west. The building will have retail/commercial uses on the street front and 100 +/- units of housing above. *The building is served by the parking garage built into the grade of the hill.*

*Id.* at 5, ¶ 28 (emphasis supplied). Spinner Place is in the West Block.

The Commission further noted that "[t]he presently existing development within the Project site is at its maximum development potential because only surface parking is

4

utilized[]" and that "[t]he only way to generate additional uses is to create multi-level parking." *Id.* at 6, ¶ 29 (internal quotation marks omitted). Plaintiff alleges that the Act 250 permit recognized that the need for parking was commensurate with the scope of development and granted permission for the development because additional parking would be provided by means of the parking garage.

Plaintiff further claims that the West Block was required to be completed in accordance with the District Environmental Commission's findings, including Condition 7 of Permit # 4C1065-1, which provides that "[n]o changes shall be made to the design or use of [the] Project (Master Plan, Phase I, and Phase II) without the written approval of the District Coordinator or the Commission, whichever is appropriate under the Environmental Board Rules." *Id.* at 6, ¶ 31 (internal quotation marks omitted). Permit # 4C1065-1 was not appealed and is thus final. No permit amendment regarding the West Block, its residential units, including Spinner Place, or the parking garage was sought or obtained. According to Plaintiff, because the Permit has an indefinite term, it remains in effect.

## B. The City's Agreements Regarding the Parking Garage and Spinner Place.

### 1. The First Amended and Restated Development and Disposition Agreement.

On or about May 24, 2004, the City and HKW entered into the First Amended and Restated Development and Disposition Agreement ("DDA") in which the City agreed that HKW would develop the residential and commercial elements of the Project, including "West Block Housing[.]" *Id.* at 6, ¶ 34 (internal quotation marks omitted). Plaintiff alleges that the DDA recognizes that the parking garage is required municipal infrastructure necessary to serve all downtown uses, including residential uses, and provides that the City "shall develop, own, and be responsible for operating the parking garage." (Doc. 14 at 7, ¶ 35.)[3] The DDA purportedly further states that the City will

---

[3] Because the DDA was not attached to Plaintiff's First Amended Complaint, the court relies on Plaintiff's allegations with regard to its contents.

5

lease 230 spaces in the parking garage to HKW in accordance with a "Parking Agreement." *Id.* at 7, ¶ 36.

The Parking Agreement, which is attached to the DDA, allocates parking spaces for HKW to serve Spinner Place and specifies that a portion of the 230 spaces in the parking garage "*shall be assigned to the operator of the student housing on floors 2-6 of [Spinner Place]*." *Id.* at 7, ¶ 37 (internal quotation marks omitted and alteration in original) (emphasis supplied). The Parking Agreement was amended and extended at least three times. The First Amended Parking Agreement is dated December 22, 2005 and allegedly provides Spinner Place and the Unit 1 retail and commercial space with 146 parking spaces in the parking garage. The amendments to the Parking Agreement also acknowledge that "*it is an obligation of the City under the DDA to grant HKW the right to use the Parking Garage upon certain terms and conditions.*" *Id.* at 7, ¶ 38 (internal quotation marks omitted) (emphasis supplied). The amendments further state that "the City's permanent zoning bylaws require[] that the projects be constructed or developed in the downtown core district [and] provide parking according to the terms of such permanent zoning bylaws[.]" *Id.* at 7, ¶ 39.

Pursuant to the City's zoning bylaws in effect when the permitting was issued for Spinner Place, "the developer and owner of a project [must] provide 0.6 parking spaces per bedroom for the Spinner Place . . ., or 187 parking spaces (312 units X 0.6 = 187.2)." *Id.* at 7, ¶ 40. According to Plaintiff, parking and marketing studies, including studies submitted as part of the Act 250 permitting process, are consistent with the City's zoning bylaws and conclude that Spinner Place requires at least 187 parking spaces.

On or about February 7, 2005, the City amended its zoning bylaws. In relevant part, those amendments state:

> All parking spaces for use in the Downtown Core District shall be located within the Downtown Core District, and shall either be located on the land where the use is occurring or the parking spaces shall be in a municipally owned or controlled parking facility, in which event, the applicant shall provide a written contract with the municipality which guarantees the continuous use of the required parking spaces for the particular use(s) . . . for the reasonable expected duration of the use(s).

6

(Doc. 14 at 8, ¶ 42.)

## 2. The City's Declaration of Covenants, Easements, Conditions and Restrictions for the Winooski Downtown Redevelopment Project.

On May 25, 2004, the City executed a Declaration of Covenants, Easements, Conditions and Restrictions for the Winooski Downtown Redevelopment Project (the "Declaration"). The Declaration provides that the property described therein, which includes the parking garage, "shall inure to the benefit of each and every owner of all or any portion of the Lots depicted on the Lot Plan and Project Plans[,]" including Spinner Place. (Doc. 10-1 at 2, § 1.1.)[4] The Declaration further states that the City is responsible "for the construction of all Public Infrastructure Improvements for the Project[,]" including "the public garage on Lot 4," *id.* at 6, § 3.1, and for the "maintenance and repair" of the parking garage. *Id.* at 8, § 4.1.

## 3. The Ground Lease.

On July 1, 2004 the City, as Landlord, entered into the "Ground Lease" with the tenant, the University of Vermont and State Agricultural College ("UVM"), in which the City leased land for the development of Spinner Place.[5] Section 1(a) of the Ground Lease provides that:

> *Tenant acknowledges and agrees that the Premises does not include any appurtenant rights to park vehicles in the municipal parking facility to be constructed on Lot 4*; Tenant represents to [the City] that it intends to seek any such parking rights from HKW, and it agrees not to seek any such rights from Landlord as an appurtenance to the Premises in consideration of the Rent payable hereunder.

(Doc. 15-1 at 4, § 1(a)) (emphasis supplied).

The Ground Lease, however, also states that Spinner Place will have access to the parking garage:

---

[4] Plaintiff attached a copy of the Declaration to its opposition to the motion to dismiss. In the absence of a motion to strike, the court treats the Declaration as integral to the First Amended Complaint.

[5] The City attached a copy of the Ground Lease to its motion to dismiss. Plaintiff does not challenge the authenticity of the document and agrees that the court may consider it in its analysis of the pending motion.

7

[The City] hereby reserves to itself, its successors and assigns, and hereby grants to Tenant, its successors and assigns, all necessary non-exclusive rights of access between the Property and the parking garage to be constructed on Lot 4, including without limitation, rights of vehicular and pedestrian ingress and egress from East Canal Street, Main Street and Barlow Street to Lot 4 via the driveways and walkways incorporated in the approved design of the Building, as detailed on the plans approved in connection with the issuance of State of Vermont Land Use Permit No. 4C1065, as amended, or as shown on the approved Plans and Specifications, as defined in the CHF Sublease Agreement.

*Id.* at 4, § 1(b).[6] Pursuant to the Ground Lease's "Eminent Domain" provision, if "any public or private authority shall, under the power of eminent domain, make a taking:" resulting in the reduction of parking space in the parking garage "by twenty-five percent (25%) or more, . . . then either [the City] or Tenant" may terminate the lease. *Id.* at 24, § 17(b)(ii). Plaintiff contends this affirms that it had a property right in the parking garage that could be the subject of eminent domain.

Attached to the Ground Lease is a Sub-Ground Lease, dated July 1, 2004, and approved and signed by the City, wherein UVM sub-leased Spinner Place to CHF-Winooski.[7] According to Plaintiff, both the Ground Lease and Sub-Ground Lease recognize Plaintiff's rights as trustee under the Bond documents, leasehold mortgage, and related documents. Plaintiff claims that "[t]hrough the Ground Lease and Sub-Ground Lease, and other documents, the City acknowledged and approved the issuance of tax-exempt bonds, the terms of the financing[,] and the Bond documents[]" and further agreed "to cooperate in assuring the full financial viability of the Spinner Place residential units." (Doc. 14 at 9, ¶ 52.) These City-approved leases thus allegedly "obligate the City to act consistently with the financing and Bond documents referenced in the leases[] and preclude the City from undermining the project's value or otherwise interfering with the tenants' quiet enjoyment of [Spinner Place]." *Id.* at 10, ¶ 52.

---

[6] Although the Ground Lease refers to vehicular ingress and egress, as opposed to parking, arguably there would be no purpose to vehicular ingress and egress unaccompanied by parking.

[7] The Sub-Ground Lease was not attached to the Ground Lease submitted as an exhibit to the City's motion to dismiss.

Similarly, Plaintiff alleges that the "financing and Bond documents . . . require [the City to] compl[y] with all legal requirements, which include the Act 250 permits and zoning bylaws." *Id.* In particular, the Bond documents purportedly specify that "[t]he Project" will include "a structured parking garage for use by residents, among others." *Id.* at 10, ¶ 53 (internal quotation marks omitted).

In 2005 and 2006, Spinner Place was built. In the fall of 2006, when students' occupation of Spinner Place began, the City provided parking in the adjacent parking garage through its Parking Agreement with HKW until February 8, 2010, at which point the City assumed "managerial and financial control of the [p]arking [g]arage spaces for Spinner Place[.]" (Doc. 14 at 10, ¶ 55.) From February 8, 2010 through December 31, 2016, the City provided parking garage spaces to Spinner Place through the property manager for Spinner Place, HallKeen Management.

C.    **The City's Alleged Arbitrary Taking of Parking from Spinner Place.**

By letter dated October 3, 2016, the City informed HallKeen Management that effective January 1, 2017, "it will no longer be leasing spaces in the garage to customers without a long[-]term contract, including Spinner Place residents." *Id.* at 11, ¶ 58 (internal quotation marks omitted).[8] The letter further stated that "[p]ublic metered spaces are available for use by any garage customer displaced by this change." *Id.* (internal quotation marks omitted). The City allegedly did not provide a reason for its decision. At the time, Plaintiff asserts that Spinner Place's payments to the City for parking garage spaces were current. During an October 6, 2016 meeting between an unidentified majority bondholder and the City's interim city manager and legal counsel, held three days after the City sent its termination letter, but before HallKeen Management received it, the City did not mention its termination of parking rights for Spinner Place residents. Plaintiff alleges that the public metered spaces referenced in the October 3, 2016 letter require payments to a meter at regular intervals, a practice which is

---

[8] The City attached a copy of this letter to its motion to dismiss. Plaintiff does not challenge the authenticity of the letter. The court will thus consider the letter as integral to the First Amended Complaint.

9

"inconsistent with residential parking[,] . . . more than four times greater than typical monthly residential parking rates for downtown parking, and grossly out of proportion with fair market student parking rates." (Doc. 14 at 11, ¶ 61.)

Plaintiff further alleges that during the same period in which the City terminated parking for Spinner Place residents, it has leased spaces in the parking garage to several other entities and thereby oversubscribed the parking garage. For example, in August of 2016, the City entered into an agreement with a "yet-to-be developed concert and performing arts venue to provide up to 550 spaces in the parking garage 'located at Spinner Place' for evening and weekend events – the same time that Spinner Place residents are typically at home and need parking." *Id.* at 12, ¶ 62. Plaintiff thus claims that the City "continues to pursue its goal and policy of developing and redeveloping its Downtown[, and] [t]he City's actions here were in furtherance of its policy and efforts to encourage development and redevelopment of its Downtown. However, the City has no current or firm plans to increase the capacity of Downtown parking." *Id.* at 12, ¶ 63.

At present, the parking garage remains oversubscribed. Of its 916 parking spaces, the City has allegedly contracted to provide 928 parking spaces to various other entities. Plaintiff alleges that, despite its repeated efforts, the City "has refused to even discuss terms for a long-term contract for use of the [p]arking [g]arage for the Spinner Place . . .[,]" *id.* at 12, ¶ 65, because the City is "concerned that any attempt to provide such parking will result in litigation with the other parties with which the City subsequently entered into parking contracts." *Id.* at 12, ¶ 66.

Plaintiff claims that the City's decision to eliminate parking garage spaces for Spinner Place resulted in "a significant adverse effect on the rental value of the Spinner Place[,]" made it more difficult to lease rental units, and has caused, and will continue to cause, Plaintiff "significant damages and expense[]" in order to keep Spinner Place viable without guaranteed parking. *Id.* at 12, ¶¶ 67-68.

10

## II. Conclusions of Law and Analysis.

### A. Whether the Court May Consider Pages from the City's Website with Regard to City Parking.

In addition to the allegations of the First Amended Complaint, the City argues that the court is entitled to take judicial notice of the City's website, which purportedly demonstrates that "[p]aid parking is available throughout Downtown Winooski at the rate of $1 per hour[,]" with Sundays and holidays free, through kiosk pay stations located in multiple locations. The webpages further state that drivers can use the "Way to Park app[lication] . . . when adding or extending meter time [from one's] mobile device." (Doc. 15-3 at 2.) Plaintiff opposes consideration of the webpages, contending they are not appropriate for judicial notice because they are unauthenticated and because the City attached "an incomplete copy of its website" (Doc. 10 at 6) which does not provide any description of the "Way to Park" application.

On a motion to dismiss, the court "may properly take judicial notice of [a] document" when the document is "publicly available and its accuracy cannot reasonably be questioned." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); Fed. R. Evid. 201(b)(2) (providing that a court "may judicially notice a fact that is not subject to reasonable dispute because it[] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Judicial notice is invoked to "establish the existence of the [statements in the document], not for the truth of the facts asserted" therein. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks omitted). In taking judicial notice of a website, the court can consider the existence of a webpage, but not the truth of its contents, if disputed. *See Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, 2016 WL 1274541, at *13 (E.D.N.Y. Mar. 31, 2016) ("[E]ven if the [c]ourt took judicial notice of the website, the [c]ourt could only take notice of the fact that [the] website states it has an asset investigation department, as opposed to the fact that such a department actually exists, which Plaintiff disputes.").

11

Although Plaintiff argues that the webpages are not authenticated, Plaintiff does not dispute that the City offers a "Way to Park" application accessible from a mobile device, and that metered parking is available in downtown Winooski at the rate of $1 per hour, with Sundays and holidays free, through kiosk pay stations. Plaintiff further does not assert that the copies of the webpages are not true copies. Finally, Plaintiff does not dispute that the contents of the pages are accurate, albeit incomplete. Against this backdrop, because the facts set forth on pages of the City's website are "publicly available" and their "accuracy cannot reasonably be questioned[,]" they are a proper subject of judicial notice. *Apotex*, 823 F.3d at 60.

## B.   Whether Plaintiff has Article III Standing.

Plaintiff raises its takings, procedural due process, and substantive due process claims under to 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights" but instead "provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cty. of Oneida*, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted). In order to prevail in a claim brought under Section 1983, Plaintiff must allege "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The City tacitly admits its actions were taken under the color of law, but contests all other elements of Plaintiff's Section 1983 claims.

Pursuant to Fed. R. Civ. P. 12(b)(1), the City seeks dismissal of Plaintiff's claims for lack of standing. Standing is "[a]n important component of the Article III jurisdictional limit of federal courts to deciding 'cases' or 'controversies[.]'" *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."

12

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "'A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Makarova*, 201 F.3d at 113).

The City asserts that, as the bond trustee for the holders of the Bonds secured by a leasehold mortgage on Spinner Place, Plaintiff has not suffered an injury in fact fairly traceable to the challenged conduct of the City which can be redressed by a favorable judicial decision.[9] Plaintiff responds that its standing arises from its responsibility to preserve the value of Spinner Place by assuring that it will continue to make principal and interest payments on the Bonds. As a corollary, or in the alternative, Plaintiff argues that "it is a third-party beneficiary" of property interests held by CHF-Winooski for the benefit of Spinner Place. (Doc. 26 at 2.)

Whether Plaintiff has standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The "irreducible constitutional minimum" of Article III standing requires the plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Id.* (internal quotation marks and alteration omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [because] on a motion to dismiss [the court]

---

[9] The fact that the City first raised this argument in its reply brief does not waive the issue because if the court "determines at any time that it lacks subject-matter jurisdiction," it "must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016) (noting that "where a complaint is dismissed for lack of Article III standing, . . [the] dismissal is one for lack of subject matter jurisdiction, . . . and without jurisdiction, the district court lacks the power to adjudicate the merits of the case."); *Sasser v. Adm'r, U.S. E.P.A.*, 990 F.2d 127, 129 (4th Cir. 1993) (holding that a challenge to the court's subject matter jurisdiction was "timely" and "properly before the court[]" when it was first raised in the defendant's reply brief on appeal). Because Plaintiff addressed standing in its sur-reply, the issue has been fully briefed.

13

presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted).

The first requirement for Article III standing is that the plaintiff articulate an injury in fact, "which helps to ensure the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth*, 422 U.S. at 498). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan*, 504 U.S. at 560). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). For an injury to be "concrete," "it must actually exist." *Id.* (internal quotation marks omitted). While hypothetical or conjectural injuries will not suffice, an allegation of future injury may be sufficient if the threatened injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Plaintiff asserts that its injury in fact arises from its position as trustee to the bondholders who hold the Bonds secured by a leasehold mortgage on Spinner Place. A trustee's powers derive from the instruments creating the trust relationship. *See Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 464 (1980) (considering the instruments creating a trust relationship to determine the scope of a trustee's powers "to hold, manage, and dispose of assets for the benefit of others"); *see also Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement."). Although the agreement creating the trust relationship is not before the court, accepting Plaintiff's factual allegations as true, Plaintiff purports to be entitled to "exercise all rights under the leasehold mortgage and has full rights to protect the collateral[, Spinner Place,] for the Bonds." (Doc. 14 at 2, ¶ 5.) As a result, Plaintiff alleges it is "broadly empowered as [t]rustee" to bring claims on behalf of the

14

bondholders. *Cont'l Bank, Nat. Ass'n v. Vill. of Ludlow*, 777 F. Supp. 92, 98 (D. Mass. 1991) (concluding that "Continental is broadly empowered as Trustee under the Bond Resolution to bring the claims now before the [c]ourt and consequently has proper standing as the legitimate contractual representative of the affected Bondholders.").[10]

Plaintiff claims that Spinner Place, as the collateral for the Bonds, is the sole source of funds for making the principal and interest payments to the bondholders. As such, Plaintiff "has an active interest" in the "management and operation" of Spinner Place in order "to best preserve and increase the value of the collateral for the Bonds, assure the financial viability of Spinner Place . . ., and best meet [the] financial and other obligations of the borrower of the Bond proceeds." (Doc. 14 at 2, ¶ 5.) Use of the parking garage is a purported property interest held by CHF-Winooski. Plaintiff thus asserts, as the bond trustee, that the City's reallocation of parking spaces in the parking garage resulted in "a significant adverse effect on the rental value of the Spinner Place" and that it has incurred "significant damages and expense[]" in order to keep Spinner Place viable without guaranteed parking. *Id.* at 12, ¶ 67-68.

Assuming a good faith factual basis for Plaintiff's claims, Plaintiff's economic losses are sufficiently "concrete and particularized[]" to plausibly allege an injury in fact. *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks omitted). Moreover, because the City's purported taking of Spinner Place's parking resulted in and will continue to diminish the value of the student housing complex, Plaintiff has plausibly alleged a "causal connection between the injury and the conduct complained of," that is fairly traceable to the City's actions. *Lujan*, 504 U.S. at 560.

---

[10] Plaintiff's alleged "broad empowerment" distinguishes this case from *Premier Bank v. Tierney*, 114 F. Supp. 2d 877 (W.D. Mo. 2000). In *Tierney*, the indenture and mortgage agreements permitted the plaintiff, as trustee, to pursue "the bondholders' claims to enforce the bonds themselves[,]" but not "to pursue the bondholders' freestanding tort claims[.]" *Id.* at 880-81. *In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010), the other case cited by the City, is inapposite as it arises out of the sale of the debtor's assets and was not a freestanding tort claim. *See id.* at 95-96 (affirming the bankruptcy court and holding that a bondholder, as a general unsecured creditor with no particularized property interest, has no standing to assert a Fifth Amendment "takings" claim).

The third and final prong of Article III standing requires Plaintiff to plausibly allege that its injury in fact will likely be redressed by a favorable court decision. Plaintiff seeks injunctive relief to restore parking in the parking garage to Spinner Place which, if granted, would preserve the rental value of the apartment units and thus protect the value of the Bonds. Additionally, Plaintiff seeks damages that, if awarded, would redress the added costs and expenses Plaintiff incurred to keep Spinner Place viable without guaranteed parking. Plaintiff has therefore plausibly alleged that a favorable court decision will redress its injuries.

For the foregoing reasons, the court finds that Plaintiff has sufficiently alleged the elements required to establish Article III standing at this stage of the litigation. The City's motion to dismiss for lack of standing and subject matter jurisdiction is therefore DENIED.

## C. Whether Plaintiff's Takings and Procedural Due Process Claims are Ripe.

Count Two of Plaintiff's First Amended Complaint alleges that the City "took parking for a use that is not public and has not provided any compensation for the parking it took from Spinner Place[.]" (Doc. 14 at 13.) Relying on *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the City argues that Plaintiff's takings claim, as well as its procedural and substantive due process claims which arise from the same nucleus of facts, are not ripe for federal court review until a final decision is reached by local authorities and Plaintiff exhausts its state remedies in seeking just compensation. Plaintiff responds that *Williamson County*'s ripeness requirements do not apply because it seeks injunctive relief in order to restore parking improperly taken by the City for a non-public use.

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The Fifth Amendment thus prohibits two types of takings: "takings without just

16

compensation and takings for a private purpose." *Rumber v. D.C.*, 487 F.3d 941, 943 (D.C. Cir. 2007).

Because Plaintiff alleges that the City took the parking for a non-public use and seeks injunctive relief, not just compensation, requiring the City to restore parking in the parking garage for Spinner Place, Plaintiff asserts a takings claim pursuant to the Public Use Clause. The ripeness requirements in *Williamson County* have not been extended to such claims. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson Cty.*, 473 U.S at 195. Thus, the Supreme Court's determination that the question of whether a "taking" occurred "simply cannot be evaluated until the [relevant state actor] has arrived at a final, definitive position[,]" *id* at 191, is not implicated. For this same reason, the Second Circuit's decision in *Progressive Credit Union v. City of New York*, 889 F.3d 40 (2d Cir. 2018) is not applicable.[11]

For claims brought pursuant to the Public Use Clause, the Supreme Court has "repeatedly" found that "'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) (quoting *Thompson v. Consol. Gas Corp.*, 300 U.S. 55, 80 (1937)); *see also Lingle v. Chevron U.S.A.*, 544 U.S. 528, 543 (2005) ("[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action."). Consequently, *Williamson County*'s ripeness requirements do "not apply to [Plaintiff's] Public Use Clause claim." *Carole Media LLC v. New Jersey Transit Corp.*,

---

[11] *Progressive* is distinguishable for the further reason that the interest at issue here is not "the product of a regulatory scheme that also vests the City with broad discretion to alter or extinguish that interest." *Id.* at 53 (internal quotation marks omitted) (quoting *Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 274 (5th Cir. 2012)).

17

550 F.3d 302, 308 (3d Cir. 2008).[12] This is because "the Fifth Amendment Takings Clause protects two distinct rights and *Williamson County* does not explicitly require exhaustion for all Fifth Amendment claims." *Rumber*, 487 F.3d at 944.

A Public Use Clause claim is therefore "ripe before the plaintiff seeks just compensation through state procedures because such 'proceedings do not supply the appropriate remedy.'" *Carole Media*, 550 F.3d at 308 (quoting *Montgomery v. Carter Cty.*, 226 F.3d 758, 767 (6th Cir. 2000)). For a Public Use Clause claim, "state proceedings to determine appropriate compensation would not obviate the constitutional question." *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 16 (1st Cir. 2010). "Requiring a plaintiff to wait before suing in federal court, when her sole claim is that she was dispossessed of property for a private use, would have only one apparent purpose—to force the plaintiff to vet her claims in state proceedings . . . before the claims can be aired in federal court." *Montgomery*, 226 F.3d at 766-67.

Contrary to the City's contention, *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1156 (2015), does not require a different result. In *Kurtz*, the Second Circuit held that *Williamson County*'s finality and exhaustion requirements apply to regulatory and physical takings, as well as procedural and substantive due process claims, where the plaintiff seeks just compensation. The remaining cases cited by the City in support of the proposition that "Second Circuit case

---

[12] Although the Second Circuit has not ruled on this issue, "the vast majority of circuits . . . have held that [the] ripeness requirement of going through state procedures does not apply to claims that a taking was not for a 'public use.'" *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 16 (1st Cir. 2010) (collecting cases from the Third, Fifth, Sixth, Eighth, Ninth, and D.C. Circuits). The Seventh Circuit takes the opposite approach, holding that "Takings Clause litigants must first take their claim to state court even when [the] plaintiffs[] . . . are alleging a taking for private purpose." *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 453 (7th Cir. 2002); *but see Peters v. Village of Clifton*, 498 F.3d 727, 732 (7th Cir. 2002) (noting potential tension between the holding in *Daniels* and the "well accepted [principle] that, when the government has taken property for a private, rather than a public, use, injunctive or declaratory relief may be appropriate") (internal quotation marks omitted).

law applying the *Williamson County* exhaustion requirement is legion[]" (Doc. 15 at 6) all involve claims under the Just Compensation Clause, not the Public Use Clause.[13]

In the context of this case, Plaintiff received a "final decision" from the City when the latter terminated Spinner Place's purported right to a certain number of spaces in the parking garage. *See Carole Media*, 550 F.3d at 308 (finding that "there is no doubt that [the plaintiff] has received a final decision from [the defendant] in light of the latter's termination of [the plaintiff's] licenses."). Its claim for redress in federal court does not require exhaustion of state court remedies and is therefore ripe for relief. For the foregoing reasons, the City's motion to dismiss Plaintiff's takings claim under the Public

---

[13] *See, e.g., Progressive Credit Union v. City of New York*, 889 F.3d 40, 54-55 (2d Cir. 2018) (holding that plaintiffs' claim that the New York City Taxi & Limousine Commission regulations deprived them of "'their statutory right to hail exclusivity'—without just compensation in violation of the Fifth Amendment[]" was not ripe because "plaintiffs have not yet asked the state for compensation"); *JWJ Indus., Inc. v. Oswego Cty.*, 538 F. App'x 11, 13 (2d Cir. 2013) (affirming dismissal of a takings claim on ripeness grounds because "[w]here a State provides an adequate procedure for seeking just compensation, a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through that procedure.") (internal quotation marks omitted); *Dreher v. Doherty*, 531 F. App'x 82, 83 (2d Cir. 2013) (observing that the plaintiffs' takings claim was not ripe because "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.") (internal quotation marks omitted); *Brisbane v. Milano*, 443 F. App'x 593, 595 (2d Cir. 2011) (finding the plaintiff's takings claim deficient because he "did not allege that he attempted to recover either the depreciated value of his car or the misappropriated funds spent to operate the impoundment lot."); *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 110 (2d Cir. 2009) (concluding that the district court properly rejected Island Park's claim as not ripe "because it failed to seek compensation from the State before commencing this action."); *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 99 (2d Cir. 1992) (holding that plaintiff's claim that the denial of an Act 250 permit constituted a taking without just compensation was not ripe as "a landowner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State.") (internal quotation marks omitted); *Norton v. Galligan*, 2018 WL 564568, at *5 (D. Conn. Jan. 25, 2018) ("With respect specifically to the [J]ust [C]ompensation [C]lause, a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.") (internal quotation marks omitted); *MPHJ Tech. Investments, LLC v. Sorrell*, 108 F. Supp. 3d 231, 242 (D. Vt. 2015) (dismissing patent owner's takings claim against the State of Vermont as not ripe because "a takings claim brought in federal court is not ripe until the party seeking compensation pursues the procedures provided under state law.").

Use Clause of the Fifth Amendment as set forth in Count Two for lack of ripeness is DENIED.

With regard to Count One, the City argues that Plaintiff's procedural due process claim, arising from the same circumstances as its takings claim, is not ripe for federal court review because *Williamson County* "applies with full force to due process claims (both procedural and substantive) when based on the same facts as a takings claim." *Kurtz*, 758 F.3d at 515. Because Plaintiff's Public Use Clause takings claim is not subject to the *Williamson County* ripeness requirements, the City's motion to dismiss Plaintiff's procedural due process claim for lack of ripeness is also DENIED.

### D.     Whether Dismissal for Failure to State a Claim is Warranted.

If the First Amended Complaint is not dismissed for lack of standing or on ripeness grounds, the City seeks dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. In order to survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court, however, neither "weigh[s] the evidence[,]" nor "evaluate[s] the likelihood" that a claim will be successful. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

### E.     Whether the City Took Plaintiff's Parking for a Non-Public Use.

If Plaintiff's takings claim is deemed ripe, the City argues that it must be dismissed because Plaintiff concedes that the City's actions were "in furtherance of its

policy and efforts to encourage development and redevelopment of [the City's]
Downtown." (Doc. 14 at 12, ¶ 63.) Plaintiff, however, contends that the City took the
parking spaces that served Spinner Place in order to give them to private developers, not
for a public purpose. It asks the court to refrain from dismissal in the absence of a factual
record.

The Public Use Clause, made applicable to the States through the Fourteenth
Amendment, "has long been understood to guarantee that 'one person's property may not
be taken for the benefit of another private person without a justifying public purpose,
even though compensation be paid.'" *Goldstein v. Pataki*, 516 F.3d 50, 57 (2d Cir. 2008)
(quoting *Thompson*, 300 U.S. at 80); *see also Midkiff*, 467 U.S. at 245 ("A purely private
taking could not withstand the scrutiny of the public use requirement; it would serve no
legitimate purpose of government and would thus be void.").

In determining whether a taking is for a public use, the Supreme Court has
cautioned that "[j]udicial deference is required because, in our system of government,
legislatures are better able to assess what public purposes should be advanced by an
exercise of the taking power." *Midkiff*, 467 U.S. at 244. "The Supreme Court has
therefore instructed lower courts not to 'substitute their judgment for a legislature's
judgment as to what constitutes a public use unless the use be palpably without
reasonable foundation.'" *Goldstein*, 516 F.3d at 58 (alteration omitted) (citing *Midkiff*,
467 U.S. at 241). "Without exception, the Court has defined that concept broadly,
reflecting its longstanding policy of deference to legislative judgments as to what public
needs justify the use of the takings power." *Kelo v. City of New London, Conn.*, 545 U.S.
469, 469 (2005). "The 'public use' requirement is thus coterminous with the scope of a
sovereign's police powers." *Midkiff*, 467 U.S. at 240. As a result, the court's review of a
public use determination is limited to whether "the exercise of eminent domain power is
rationally related to a conceivable public purpose[.]" *Id.* at 241.

In *Kelo*, the Supreme Court observed that "[p]romoting economic development is
a traditional and long-accepted function of government." *Kelo*, 545 U.S. at 484.
Similarly, in *Goldstein*, the Second Circuit found that "the compensated taking of private

21

property for urban renewal or community redevelopment is not proscribed by the Constitution[]" because such taking "bears at least a rational relationship to several well-established categories of public uses, among them the redress of blight, the creation of affordable housing, the creation of a public open space, and various mass-transit improvements." *Goldstein*, 516 F.3d at 58-59 (internal quotation marks omitted).

Plaintiff argues that the City took Spinner Place's parking "to give it to other private developers or potential developers." (Doc. 19 at 2, ¶ 2.) After the City allegedly terminated Spinner Place's parking rights, the City leased spaces to other entities including an agreement to provide 550 spaces in the parking garage to "a yet-to-be developed concert and performing arts venue[.]" (Doc. 14 at 12, ¶ 62.) These actions may well be within the scope of the acceptable public use requirement because "[t]he mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose." *Midkiff*, 467 U.S. at 243-244 (noting that the Supreme Court "long ago rejected any literal requirement that condemned property be put into use for the general public."); *see also Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.*, 771 F.2d 44, 46 (2d Cir. 1985) (finding that "the condemnation of appellants' building to make way for the redevelopment of the blighted area is a classic example of a taking for a public use or purpose within the law of eminent domain[]" and that "[i]t makes no difference that the property will be transferred to private developers, for the power of eminent domain is merely the means to the end."). However, in this case, there is no allegation that the City exercised its power of eminent domain. To the contrary, Plaintiff claims that the City simply took Spinner Place's parking spaces and transferred them to other private entitities.

By alleging that "the City's actions here were in furtherance of its policy and efforts to encourage development and redevelopment of its Downtown[]" (Doc. 14 at 12, ¶ 63), Plaintiff may have "effectively conceded what [the Second Circuit] found to have been a complete defense to a public-use challenge[,]" *Goldstein*, 516 F.3d at 58, but the court cannot dismiss this claim as a matter of law because there is no allegation that the

22

City exercised its eminent domain power, a necessary prerequisite. A municipality may not simply lawfully take another person's or entity's property without exercising eminent domain. *See Kelo*, 545 U.S. at 497 ("The public use requirement . . . imposes a more basic limitation, circumscribing the very scope of the eminent domain power"); *see also Goldstein*, 516 F.3d at 52 (noting that "the power of eminent domain . . . is not without limits, among them what has come to be known as the public-use requirement."). Because it is not clear that Plaintiff had a property interest in the parking spaces in question, the court must await the development of a factual record before deciding the viability of this claim. *See Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2016 WL 7176586, at \*14 (D. Vt. Dec. 7, 2016) ("At the pleading stage, dismissal of a novel claim without the benefit of discovery and a factual record is not warranted") (citing *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979)). The City's motion to dismiss Plaintiff's Public Use Clause takings claim is DENIED WITHOUT PREJUDICE.

### F.     Whether Plaintiff Plausibly Alleged a Cognizable Property Interest.

"To state a claim under either the Due Process Clause or the Takings Clause," Plaintiff must "allege facts showing that state action deprived them of a protected property interest." *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 576-79 (1972) (due process claim) and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000-04 (1984) (takings claim)). "[T]he Supreme Court has consistently applied for Takings Clause purposes the standard it developed in *Roth* for the establishment of constitutionally protected property." *Ganci v. New York City Transit Auth.*, 420 F. Supp. 2d 190, 196 (S.D.N.Y.), *aff'd*, 163 F. App'x 7 (2d Cir. 2005). "Thus, *Roth* and its progeny are instructive in defining 'property' for purposes of the Takings Clause, although it is not necessarily the case that the term 'property' in the takings context and the term 'property' in the due process context are coextensive." *Id.*

To allege a protected property interest, Plaintiff must allege more than "an abstract need or desire" or a "unilateral expectation" of the property interest, but instead must allege that it has "a legitimate claim of entitlement[.]" *Roth*, 408 U.S. at 577; *see also*

*Harrington v. Cty. of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.") (internal quotation marks omitted). "Such property interests cannot be found on the face of the Constitution, but rather 'are created, and their dimensions are defined by, existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits." *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Roth*, 408 U.S. at 577) (alterations omitted).

"When determining whether a plaintiff has a claim of entitlement, [courts] focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994). While state law defines the underlying property interest, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting *Roth*, 408 U.S. at 577). "[A]lthough a public contract can confer a protect[able] benefit, not every contract does so." *Martz*, 22 F.3d at 30; *see also Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 390 (S.D.N.Y. 2014) (concluding that the city's licensing agreement, which granted the developer the right to use designated parking spaces in a municipal parking garage, "does not give rise to a property interest protected by the Due Process Clause.").

Here, Plaintiff alleges that Spinner Place has a "property interest in [p]arking [g]arage spaces[,]" (Doc. 14 at 10, ¶ 57), which "stems, *inter alia*, from: the City's 2002 Act 250 permit" as well as "several iterations of its zoning bylaws, Development and Disposition Agreements, financial documents, and other documents." (Doc. 10 at 8.) Plaintiff points out that, prior to executing the Ground Lease, the City leased 230 spaces in the parking garage to HKW pursuant to the DDA, which specifies that a portion of these spaces "shall be assigned to the operator of the student housing on floors 2-6 of [Spinner Place]." (Doc. 14 at 7, ¶ 37) (internal quotation marks omitted and alteration in original).

Attached to the DDA is a "Parking Agreement," the amendments to which purportedly state that "it is an obligation of the City under the DDA to grant HKW the right to use the Parking Garage upon certain terms and conditions." *Id.* at 7, ¶ 38 (internal quotation marks omitted). The amendments further state that "the City's permanent zoning bylaws require[] that the projects be constructed or developed in the downtown core district [and] provide parking according to the terms of such permanent zoning bylaws[.]" *Id.* at 7, ¶ 39. Pursuant to the City's zoning bylaws in effect when the permitting was issued for Spinner Place, "the developer and owner of a project [must] provide 0.6 parking spaces per bedroom for the Spinner Place . . ., or 187 parking spaces (312 units X 0.6 = 187.2)." *Id.* at 7, ¶ 40.

From fall of 2006 until February 8, 2010, the City provided parking in the adjacent parking garage through its Parking Agreement with HKW. The City subsequently assumed "managerial and financial control of the [p]arking [g]arage spaces for Spinner Place[.]" *Id.* at 10, ¶ 55. From February 8, 2010 through December 31, 2016, the City purportedly provided parking garage spaces through the Spinner Place property manager, HallKeen Management. The nature and content of this agreement, if it exists, is not before the court.

The City counters by pointing to the Ground Lease which states that the tenant of Spinner Place "acknowledges and agrees that the Premises does not include any appurtenant rights to park vehicles in the [parking garage][,]" "represents to [the City] that it intends to seek any such parking rights from HKW[,]" and "agrees not to seek any such rights from [the City] as an appurtenance to the Premises in consideration of the Rent payable hereunder." (Doc. 15-1 at 4, § 1(a).)

While Plaintiff and the City both point to documents in support of their respective arguments, neither party adequately addresses whether the alleged right to spaces in the parking garage amounts to a "protected property interest[]" sufficient for takings and due process claims. *Story*, 978 F.2d at 62; *see also Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (declining to address an issue where the appellant did not "make a legal argument . . . advanc[ing] [his] contentions by connecting law to facts[.]").

25

Although the City disputes that Plaintiff has a valid property interest, the City addresses this argument in a cursory manner, relying exclusively on the Ground Lease without addressing the other documents Plaintiff cited.[14]

In light of the importance of determining whether Plaintiff has a constitutionally protected interest in the parking garage, the court declines to decide the issue on inadequate briefing. *See Jimmo v. Sebelius,* 2011 WL 5104355, at *22 (D. Vt. Oct. 25, 2011) (declining to address alleged grounds for dismissal due to "the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation[.]") (internal quotation marks omitted) (citing *Ibarra v. City of Chicago,* 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011)). The court thus DENIES WITHOUT PREJUDICE the City's motion to dismiss Plaintiff's claims for lack of a cognizable property interest at this time.

## G.    Whether Plaintiff's Substantive Due Process Claim of Arbitrary and Irrational Conduct States a Claim for Relief.

In Count Three of its First Amended Complaint, Plaintiff alleges that the City's "taking of parking from Spinner Place . . . was arbitrary and illegal[,]" violating its substantive due process rights. (Doc. 14 at 13, ¶ 77.) The City argues that Plaintiff failed to state a claim for relief because Plaintiff does not have a valid property interest in parking spaces in the parking garage and, even if it does, the City's conduct was not "arbitrary, conscience shocking, or oppressive in the constitutional sense[.]" (Doc. 15 at 15) (internal quotation marks omitted).

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. CONST. amend. XIV, § 1. For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, Plaintiff must allege that (1) it had a "valid property interest" and that (2) the City "infringed on that

---

[14] *See, e.g.,* Doc. 15 at 3 ("Plaintiffs' allegation that it has a constitutionally protected 'property interest' in the City's municipal garage that is enforceable against the City is demonstrably false."); *id.* at 14-15 ("The City disputes that [Plaintiff] has [a property interest]. See the Ground Lease (attached hereto as Exhibit A), § 1(a), at 3 (quoted at page three, above). But even assuming arguendo that [Plaintiff] has a valid property interest, [Plaintiff's claim] still fails the second prong of the substantive due process test[.]").

property right in an arbitrary and irrational manner." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007).

Substantive due process, however, "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005); *see also Kurtz*, 758 F.3d at 514 n.2 ("[C]ourts should not use a generalized notion of substantive due process when the Constitution provides an explicit source of protection against the conduct alleged[.]"). Rather, "the scope of substantive due process is very limited." *Gregory v. Inc. Vill. of Ctr. Island*, 2015 WL 5093623, at \*9 (E.D.N.Y. Aug. 28, 2015); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (noting that the Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

Because Plaintiff alleges that the City violated its substantive due process rights through "[t]he City's taking of parking from Spinner Place[,]" Count III arises from the same governmental action and seeks the same relief as its Public Use takings claim. (Doc. 14 at 13, ¶ 77.) Plaintiff's substantive due process claim is thus "subsumed in her more particularized" takings claim, and Count Three of the First Amended Complaint is therefore DISMISSED. *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005).[15]

## H. Whether Dismissal of Plaintiff's Procedural Due Process Claim is Warranted.

With the exception of its ripeness challenge, the City has not sought the dismissal of Plaintiff's procedural due process claim for failure to state a claim. "To succeed on a procedural due process claim, a plaintiff must first identify a property right, second show that the state has deprived him or her of that right, and third show that the deprivation

---

[15] Dismissal is warranted for the further reason that Plaintiff fails to plausibly allege conduct that would satisfy the exacting standard for a substantive due process claim. *See MacFall v. City of Rochester*, 495 F. App'x 158, 160 (2d Cir. 2012) (affirming dismissal of a plaintiff's substantive due process claim because "none of the conduct alleged in the Complaint" met the "exacting standard[]" that would "establish a violation of substantive due process rights") (internal quotation marks omitted) (citing *Okin v. Vill. of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir.2009)).

was effected without due process." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 51 (2d Cir. 2018) (internal quotation marks, alteration, and emphasis omitted). Procedural due process protects "something more than . . . ordinary contractual right[s][,]" *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988) which are "different in substance from 'welfare benefits conferred by statute upon our poorest citizens to provide for their immediate well-being, if not survival;' social security benefits; tenured status in public employment; and permanent civil service employment." *Grasson v. Bd. of Educ. of Town of Orange*, 24 F. Supp. 3d 136, 151 (D. Conn. 2014) (footnotes omitted) (quoting *S & D Maint. Co*, 844 F.2d at 965). "Rather, procedural protection is sought in connection with a state's revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits." *S & D Maint. Co.*, 844 F.2d at 966 (footnote and emphasis omitted).

The City disputes that Plaintiff has a valid property interest which is "[t]he threshold issue" in a procedural due process claim. *Narumanchi v. Bd. of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (citing *Roth*, 408 U.S. at 573). As noted, the City, however, raises this argument in a few sentences and does not otherwise address the plausibility of Plaintiff's procedural due process claim. The court thus DENIES WITHOUT PREJUDICE the City's motion to dismiss Plaintiff's procedural due process claim.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the City's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. (Doc. 15.) The court DISMISSES Count Three (Substantive Due Process). All other grounds for dismissal are DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of August, 2018.

Christina Reiss, District Judge
United States District Court